## Case No. 8,915.

### McNEIL v. MAGEE et al.

[5 Mason, 244.] [1]

Circuit Court, D. Massachusetts. May Term, 1829.

REAL PROPERTY—AGREEMENT AND AWARD—CONCURRENT ACTS—SPECIFIC PERFORMANCE—LACHES—DAMAGES—RECORD OF DEED—NOTICE.

1. Bill for a reconveyance of an estate upon an agreement and subsequent award, dismissed upon the circumstances, the bill being brought against purchasers after a considerable lapse of time, the original vendee being dead and insolvent.

2. Where an award directed each party to release to the other certain estate, and the term of 20 days was directed, within which the acts were to be done: the acts are to be deemed concurrent acts, so that neither party can insist upon a release without offering to execute a release on his own part to the other party.

[Cited in Green v. Dyersburg, Case No. 5,756.]

3. Courts of equity have jurisdiction to enforce a specific performance of an award respecting real estate. But he who seeks performance must show a readiness to perform all the award on his own part.

[Cited in Akely v. Akely, 16 Vt. 459.]

4. After long delay and laches a court of equity will not decree a specific performance of an award, especially where there has been a material change of circumstances, and injury to the other party.

[Cited in Warner v. Daniels, Case No. 17,181.]
[Cited in brief in Akely v. Akely, 16 Vt. 455. Cited in Holden v. Purifoy (N. C.) 12 S. E. 850.]

5. A fortiori, it will not decree it against purchasers even with notice, if their vendee is dead and insolvent so that they can have no remedy over.

6. Quaere, in what cases a court of equity will award damages as a compensation for delay on a bill for a specific performance.

7. In what cases the registry of a deed is constructive notice.

8. The registry of a deed or paper not duly or legally recorded, is not constructive notice.

[Cited in Montgomery v. Dorion, 6 N. H. 255; Rushin v. Shields, 11 Ga. 636.]

9. Quaere, if an award respecting real estate is required to be registered by the laws of Massachusetts.

10. Notice, if denied by the answer, must be proved by two witnesses, or by one witness and circumstances.

11. If a bill admits the defendant to be a purchaser of the legal title, and the plaintiff sets up an equitable title, and demands a conveyance of the legal title to himself, he must aver and prove all the material facts to entitle him to such conveyance. If he relies on notice in the purchaser, he must aver it in his bill, and if not admitted by the answer, he must prove the notice before he can have relief.

[Cited in Dowell v. Applegate, 7 Fed. 887.]

12. A purchaser, who chooses to answer the bill generally, need not aver, that he is a purchaser without notice. The plaintiff must prove notice.

Bill in equity [by Archdeacon McNeil against James Magee and others]. The cause came to a hearing upon the bill, answers, depositions, and exhibits.

[1] [Reported by William P. Mason, Esq.]

Sumner & Webster, for plaintiff.
William Sullivan, for respondents.

STORY, Circuit Justice. This is the case of a bill in equity, which was set down for a hearing at the last term, but from circumstances, to which it is unnecessary to allude, argued at so late a period of the term, that a continuance of it for advisement became indispensable. On the 13th of February 1808, McNeil (the plaintiff) executed two deeds of conveyance (which were recorded on the same day) to James Magee, (one of the original defendants but since deceased,) whereby, for the asserted consideration of $40,000, he granted to Magee, in fee simple, certain parcels of land in Charlestown, Massachusetts. On the same day an agreement under seal was executed between the same parties, whereby, after reciting the sale by the deeds aforesaid, and that Magee had given his notes for the $40,000 purchase money to McNeil, and that McNeil was indebted to sundry persons as by a schedule annexed, amounting to $18,850, Magee covenanted, "that whenever the said McNeil, his heirs, &c., shall feel dissatisfied with the said security of the purchase money aforesaid, or shall require a reconveyance of the estate described by said deeds, and shall give notice thereof to the said Magee, his heirs, &c., he or they shall forthwith reconvey to said McNeil, his heirs, &c., all right and title derived to him the said Magee by virtue of the two deeds aforesaid, the said McNeil giving up to the said Magee his notes aforesaid. And if the said Magee shall then have made any lease, sale, or other conveyance respecting any of the lands aforesaid, the same shall go to the benefit of the said McNeil, his heirs, &c., the notes, money, securities, or other property received in lieu thereof by said Magee to be transferred, &c., to the said McNeil, his heirs, &c., unless the said money, &c., shall have been previously applied in payment of any of said McNeil's debts as aforesaid." And it was therein afterwards declared, that "the true intent and meaning of the aforesaid contract is, that in case the said McNeil, his heirs, &c., shall elect to deliver up to the said Magee, his heirs, &c., the notes aforesaid, and have the land reconveyed to him or them as aforesaid, that the said McNeil shall account for, and repay all the sums paid by the said Magee on his said notes; and that the said Magee, his heirs, &c., shall account for all the lands sold, leased, or otherwise transferred, or incumbered either by applying the avails thereof to the said McNeil's debts as aforesaid, or any part thereof, or by transferring the said proceeds specifically to the value thereof to the said McNeil, his heirs, &c., on request; and all the residue of said estate, which may be unsold at the time of accounting as aforesaid, shall also be reconveyed to the said McNeil, his heirs, &c.; excepting however any and all incumbrances, whereby the said

McNeil is to be benefited by having the amount, for which the same may have been incumbered, applied to the discharge of his debts, as herein provided. The said Magee to retain sufficient property to pay all reasonable expenses he may incur, in all negotiations in said property, and a just and fair compensation for his own time and trouble." This agreement was not recorded until the 25th of September, 1809. There was a correspondent agreement executed by McNeil to Magee on the same day, giving Magee a like election to give up the purchase on the same terms, mutatis mutandis. Difficulties, as might naturally be expected, soon grew up between the parties in the execution of the trusts thus generally created, and carrying in their own bosom the elements of discord. On the 13th of April, 1811, McNeil and Magee entered into an agreement under seal, by which they submitted all claims and demands growing out of the deeds and contracts aforementioned, or otherwise, to three arbitrators, and covenanted to abide by any award, which they or any two of them should make in the premises, under a penalty of $50,000. It was specially covenanted, that for any sums of money which the arbitrators should award to Magee for expenditures, services, &c., he (Magee) should take in payment and satisfaction such portion of the lands conveyed to him, as the arbitrators should award; and that the arbitrators should make a valuation of the lands conveyed, and award what portion should be conveyed to Magee, and what to McNeil, and describe the same accordingly, and state the time when the deeds necessary to carry their award into effect should be executed; and that Magee should reconvey all the rest and residue to McNeil in fee simple, free of incumbrances by him made; and that McNeil, on receiving such conveyance, should release to said Magee all right, title, claim, and demand, in law and in equity, as to the portion of said land, which should remain to Magee, and be by him held. The promissory notes were to be deposited with the arbitrators; and upon delivery of such deed to McNeil, or tender of delivery, the said notes were to be given up to Magee.

The arbitrators, after many hearings of the parties, on the 21st of May, 1811 made their award. By it they awarded, that a balance of $27,100 was due from McNeil to Magee. They then proceeded to state their valuation and division of the lands conveyed, describing the same specifically, and awarded one portion, equal in value to $27,100, to Magee, and the other portion thereof, equal in value to $2832, to McNeil. They further awarded, that McNeil should within twenty days execute a deed or deeds of release to Magee, with covenants of warranty against incumbrances made by him, and of all lawful claims of persons claiming under him, as to the lands awarded to Magee. And that Magee should execute within twenty days a deed or deeds of gift, grant, bargain, sale, and release, to McNeil, of all the land awarded to him, with like covenants of warranty. On the 18th day of August 1811, Magee tendered a deed to McNeil duly executed and acknowledged by him, (Magee,) of the land awarded to McNeil, in conformity to the terms of the award; and at the same time requested McNeil to execute and acknowledge a deed of the lands awarded to him, (Magee,) which deeds were drawn up in conformity to the award. McNeil refused to receive the deed executed and acknowledged by Magee, and also to execute the deed prepared for him to execute to Magee. A suit was brought by Magee against McNeil at the January term of the court of common pleas for Suffolk county. 1812, for the penalty in the submission, to enforce the award. At the September term of the same court in 1812, a suit was brought by McNeil against Magee, upon the notes given for the $40,000 purchase money. Both of these suits were brought to a decision at the March term, 1814, of the supreme court of the state of Massachusetts, the first upon a demurrer to special pleadings; and the last upon an agreement of facts by the parties, bringing the validity of the award before the court. After a hearing and due proceedings had, the court appear to have adjudged the award good, as a bar to the suit upon the notes; and the other suit was decided in favour of McNeil upon the pleadings, the plaintiff's replication being adjudged to be bad and insufficient. In the years 1813 and 1814 Magee sold the lands awarded to McNeil, for various considerations, to certain of the defendants; and in December, 1814, he mortgaged the lands awarded to himself, (excepting that part, which had been mortgaged to Margaret Magee) to Simon Eliot for a large sum. By subsequent assignments, the same lands so conveyed to Eliot came into the hands of Amos Binney: but whether the equity of redemption had been foreclosed did not appear by any of the proofs in the cause. But it did appear, that McNeil in June, 1819, for the nominal consideration of $1, released all his title in the same lands to Binney.

To this summary of the leading facts it may be necessary, for a more full understanding of the case, to add, that the original bill was commenced at May term, 1823, against James Magee, and against sundry other persons claiming portions of the land as purchasers, &c., under him. The original bill was founded solely upon the deeds of McNeil to Magee, and the collateral agreements between them. After stating the substance of those instruments it charged, that on the 15th of October, 1810, McNeil became dissatisfied with the said security for the purchase money, and required a reconveyance of the lands then unsold from Magee; and that McNeil did then and afterwards offer and tender to Magee his notes, and to

account for and repay all sums of money paid by Magee on his notes, and on the debts of McNeil, and to permit Magee to retain sufficient property to pay all his reasonable expenses and a just and fair compensation. It then charged, that Magee, confederating with the other defendants, refused to reconvey, and that he made divers conveyances to his confederates, &c., under which they had entered and occupied; and then prayed for a discovery and account, and a delivery of possession of the lands, or of so much thereof, as he was equitably entitled to, and for further relief. Margaret Magee (one of the defendants) died in July, 1822, and James Magee died in December, 1823. Their deaths were accordingly suggested on the record. A bill of revivor was filed at May term, 1824, against the administrator of Margaret Magee, upon which process was duly issued. In January, 1825, the bill was amended in several particulars. The amended bill, among other things, stated, that James Magee was dead, having at that time no goods or estate whatsoever; and that the agreement of 1808 was recorded in September, 1809. It added other parties, as defendants to the bill, with apt words to charge them as purchasers under Magee. It then proceeded to state certain pretences, under which the confederates claimed title, denying the same; and, among other things, stated, that they set up the submission and award before mentioned, and the refusal of McNeil to comply with the same. It admitted the existence of the submission and award, but charged that the arbitrators had no authority to award a deed of any particular form, or containing any particular covenants to be made by McNeil to Magee; and that the arbitrators exceeded their authority in prescribing such form of the deeds to be given by McNeil and by Magee; and further, that the award was not pursuant to the submission in another respect, inasmuch as it did not fix the day, on which the deeds should be delivered by the parties, nor that Magee should first make, execute, and deliver to McNeil a deed of the lands set off to him, nor make any award respecting the notes; and that on these accounts it was null and void. But if valid, it charged, that Magee did not execute the proper deeds, nor were the lands free of incumbrances made by Magee; and that a delivery of such deed of the lands, free of incumbrances, was a condition precedent to any act to be done by McNeil, and that McNeil is now entitled to the lands so set off to him. It then charged, that the confederates had notice of the conditions and trusts, on which the lands were held by Magee, and of the award, and of the title of McNeil, &c., at the time of their respective purchases. It then stated another pretence, viz. that a large portion of the lands was mortgaged to one Simon Eliot, and by him assigned to one Amos Binney, to whom afterwards McNeil released all his right and title; and charged, that a part only

of such lands contained in the original deeds was so conveyed, and that the mortgage had been paid off and satisfied. The amended bill then stated, that a part of the lands (to some of which Samuel Jaques, one of the defendants, claimed title) was mortgaged by McNeil to Margaret Magee, the defendant, on the 28th of August, 1801, as security for $7000, with power to sell; and on the 28th of August, 1807, was again mortgaged by McNeil to her for $7000, and that it was pretended, that she took peaceable possession for non-payment, and continued the possession until the 29th of March, 1811, and then granted the premises to James Magee in fee, who then executed a deed of covenant to reconvey the same to her on request; and that afterwards, on the 15th of October, 1813, he did reconvey the same to her in fee, and that the mortgage money was never paid, and the mortgage was thereby foreclosed. It charged on the contrary, that the mortgage money was paid, and the mortgages ought to have been discharged; that there was no foreclosure or possession as pretended, &c.; that these conveyances and release by James Magee to the said Margaret were without a valuable consideration, and she at the time well knew, that he held the equity in the same lands upon the conditions and trusts abovementioned; and had no right to give such a release.

At May term, 1827, a bill of revivor was filed to revive the cause against Simon E. Greene, administrator of James Magee, who subsequently appeared, and filed an answer. At May term, 1828, upon motion of the plaintiff the bill was dismissed as to Margaret Magee and her representative, and her name was struck out of the bill. And the like dismissal took place as to Jonathan Amory, one of the defendants, who died pending the proceedings. The general replication having been filed, the cause was, by the consent of the parties, set down for a hearing at October term, 1828; and upon breaking the argument, it having been intimated by the court, that the decision of the state court was conclusive as to the objections taken to the validity of the award, a motion was then made to amend the bill, so as to confine the relief prayed for to that parcel of the lands, which had been assigned by the award to McNeil. The motion was somewhat irregular; but under the peculiar circumstances of the case was allowed, as it would not occasion any further delay. The bill was then amended by confining the relief prayed for to the lands so awarded to McNeil, and by striking out all that portion of the bill, which stated objections to the validity of the award. And the bill was treated, as if it stood dismissed by consent against all the defendants, except Magee's administrator, and the defendants, who made claim to the lands so awarded to McNeil.

Such is the posture of the case, as it was presented at the final argument; and it has

been necessary to detail the proceedings somewhat at large in the order of time, that the pressure of some of the points made at the bar may be fully comprehended. It is obvious that the case made by the original bill has been abandoned. That case proceeded mainly upon the ground, that McNeil had become dissatisfied with his security in the notes for the purchase money; had notified that fact to Magee; had offered a full compliance, on his own part, of the terms and conditions, on which he was entitled to a reconveyance; and had demanded a reconveyance in October, 1810. His dissatisfaction is established, or rather admitted; but his compliance with the terms, on which he was entitled to a reconveyance, is not only not established, but is at war with the proofs in the cause. And no notice of that dissatisfaction, as averred, has been brought home to the purchasers under Magee, unless it be since the promulgation of the award. But if it had been otherwise, the subsequent submission and award, supposing the latter to be valid, would completely displace all equitable relief founded merely upon the original agreement in 1808. The validity of the award was effectually decided by the state court; and the subsequent amendment of the bill puts the right to relief upon the ground of the award; and, therefore, the case is now narrowed down to the consideration of the bill, as it stands connected with that award, and the accompanying facts.

The questions then, presented to the court for decision, ultimately resolve themselves into the following points: In the first place, whether the plaintiff would now be entitled to the relief prayed for upon the case made by the pleadings, and proofs against Magee himself, if living? If he would be so entitled, then, whether, under all the circumstances, the plaintiff is entitled to the relief sought against the defendants, who are purchasers of the lands under Magee.

Upon the first point the defendants have taken several objections to any relief, even against Magee himself. The first objection is founded upon the statements of the amended bill itself, the award being made a part of that bill. It contains no allegation of any compliance with the terms of the award on the part of McNeil, by his executing a deed of release, as therein required of him, nor of any tender of performance on his part. But it sets up as an excuse, that a delivery of a deed of the lands awarded to McNeil, free of any incumbrances by Magee, was a condition to be performed by Magee, precedent to any act on the part of McNeil; and that Magee never executed, or tendered any such deed; and that the lands so to be conveyed were not, at any time after the award, free of incumbrances. The objection is, that the award creates no such condition precedent; and therefore the plaintiff is not entitled to the relief he seeks, since there has been a total failure on his part to comply with the terms of the

award. Upon examining the ward, it does not appear to me, that there is any ground for the suggestion, that the delivery of the deed by Magee was in that instrument made a condition precedent, as asserted in the bill, whatever might be the case standing upon the terms of the submission. Both deeds were to be executed and delivered within twenty days from the date of the award. There is nothing in the nature of the act to be done, which implies any priority on either side. And if any conclusion could be drawn (as I think it could not be) from the mere order, in which the acts are stated in the award, McNeil would be to perform the first act, since his act is first named. And as Magee was in possession of the legal title, which, by the terms of the original agreement in 1808, he had a right to hold, until he was fully indemnified and paid for all his advances, no inference can be deduced, that the arbitrators intended to diminish his security, until his indemnity was complete. The natural reasoning from the posture of the parties antecedent to the submission would be in favour of Magee, and that McNeil was to do the first act. But it appears to me, that the true view of the matter even at law is, that they are concurrent, or dependent acts; and that neither party had a right to demand a performance of the other, without a performance or tender of performance at the same time on his own part. If the case had been of mutual covenants to execute deeds, within the twenty days, of the lands awarded, neither party could in my judgment have recovered at law for a breach, without such an averment of performance. The one act would constitute the consideration for the other. It would be repugnant to all justice to require, that McNeil, refusing to perform his part of the award, should yet be entitled to demand a surrender of the legal title to the lands awarded to him from Magee. The submission does, indeed, contain a clause, which might be construed to require a prior performance by Magee, before McNeil would be in default on his covenant. The language there is, that Magee shall reconvey the land awarded to McNeil, and that McNeil, "on receiving such conveyance, shall release to Magee all right, &c., to the portion of said land" awarded to Magee. But it appears to me, that the true construction of the submission, taking into view its whole objects and terms, is that, which the arbitrators gave to it, that is to say, that the acts should be concurrent. Magee was to give a conveyance on receiving a release from McNeil, and McNeil was to give a release upon receiving a conveyance from Magee. The acts were to be concurrent, and to be executed at the same time. It was like the common case of covenants on a purchase, where one party covenants to give a deed on receiving the purchase money, and the other party covenants to pay the money on receiving the deed. In such a case, neither can recover at law without showing a perform-

ance, or tender of performance, on his part. It is not necessary to go into an examination of the cases at law on this subject, though the cases cited at the bar, and especially Glazebrook v. Woodrow, 8 Term R. 366, are strongly in point.[2] The general principles, by which questions of this sort, arising under agreements, are construed, are the same both at law and in equity. Where there are mutual covenants or acts, they are construed to be dependent, unless a contrary intention appears (Sugd. Vend. c. 4, § 3; Bank of Columbia v. Hagner, 1 Pet. [26 U. S.] 455, 465); and there is good sense as well as practical convenience in the rule.

But it is the less necessary to sift this matter minutely, because we are in a court of equity; and in such a court, he who seeks equity must do it. Now, the specific performance of a contract by a court of equity is not a matter of course, but rests in the sound discretion of the court; not, indeed, in an arbitrary discretion, but such as rests upon grounds of justice. Com. Dig. "Chancery," 2, c. 16; Sugd. Vend. c. 4, § 2. Goring v. Nash, 3 Atk. 186; Joynes v. Statham, Id. 387; Davis v. Symonds, 1 Cox, 402; Seymour v. Delancey, 6 Johns. Ch. 222. It may be refused, whenever there are circumstances, which show it to be inequitable or improper; and the party is then left to his remedy at law. And it may be laid down as a general rule, subject to few, if any, exceptions, that where specific performance is sought, the court will require the party, who seeks it, to show a performance or readiness to perform, on his own part, or a default on the other side, which utterly excuses him. 1 Madd. Ch. Prac. 331; Colson v. Thompson, 2 Wheat. [15 U. S.] 336; 1 Fonbl. Eq. bk. 1, c. 6, §§ 1, 2, and notes.

In respect to awards, whatever may have been the case formerly, no doubt at present exists, that courts of equity have jurisdiction to enforce a specific performance of them. But the ground is, that it is but an execution of the agreement of the parties, ascertained and fixed by the arbitrators. Hall v. Hardy, 3 P. Wms. 187; Norton v. Mascall, 2 Vern. 24; Blundell v. Brettargh, 17 Ves. 232; Wood v. Griffith, 1 Swanst. 43, 54; Bishop v. Webster, 1 Eq. Cas. Abr. 51; Thompson v. Noel, 1 Atk. 60, 62. So that the case falls clearly within the general rule laid down as to performance, where a specific execution is sought. The doctrine is well summed up in Mr. Fonblanque's treatise on Equity, in the text and notes. Book 1, c. 6, §§ 1, 2. The case of Ewes v. Blackwall, Finch, 22, goes farther; and seems to assert a principle, that unless the party seeking relief has strictly performed the award on his part, the other shall be let in to every equity without any regard to the award. Whether it can be supported to this extent, it is unnecessary now to consider; and the case (which is very imperfectly reported)

may well have stood on its own peculiar circumstances. In this view, the case of the plaintiff is surrounded by some difficulties. The bill does not, as has been already suggested, aver any performance or tender of performance, or even a present readiness to perform, on the part of the plaintiff, the requisitions of the award. The excuse for non-performance, as we have already seen, fails in point of law. There was no condition precedent on the part of Magee; and if there had been, I should very much doubt if in a court of equity, under circumstances like the present, the plaintiff could entitle himself to a decree for specific performance, without showing an ability and an offer to perform on his own part. But I should have no doubt, that if entitled to any decree, it ought to be a conditional one only, that is, a decree stipulating for a performance on his part, eodem flatu, as one of the terms of the decree. It by no means follows, that because Magee might not be in a condition to demand a specific performance, the plaintiff might have it without complying with the terms of the award. But passing by these considerations growing out of the frame of the bill, let us advert to the objections founded on the merits of the case, as against Magee, as they are disclosed upon the answers and proofs.

Some commentary has been made at the bar upon the nature and effect of the deeds and agreements in 1808. It has been said, that taking the whole together the transaction amounts to a mortgage to Magee with a power to sell. Putting it in the light contemplated by the parties upon the face of the instruments, the transaction seems rather to have assumed the character of a conditional purchase with an election in either party, by notice, to convert it into a conveyance on trust to reconvey to McNeil, he discharging all the claims of the other party, all the estate undisposed of by Magee at the time of such notice. But independent of such notice, Magee had an unlimited and absolute power of disposal, of all the property conveyed, in respect to third persons. The submission and award converted the conditional purchase into an absolute title in Magee, as to all the lands awarded to him, and as to the residue, awarded to McNeil, converted Magee into a trustee of the latter. After that award, he certainly had no power to give a good title in the trust property to any person having notice of the trust. What is sufficient notice, will become matter of subsequent inquiry. It is clear, that on the 18th of August, 1811, Magee did tender a deed, with the proper covenants, to McNeil, of the lands awarded to the latter. This is conclusively established by the deposition of Mr. Welsh. And it appears by the same testimony, that Magee at the same time tendered to McNeil the correspondent deed of release to be executed by the latter, which he utterly refused. There is no proof that any tender of performance had been made on either

---

[2] See, also, 1 Sandf. Ch. 320, note 4; Sugd. Vend. c. 4, p. 227, § 3; 1 Fonbl. Eq. bk. 1, c. 6, § 1, and notes.

side within the twenty days prescribed by the award, although there is an averment of performance by Magee within the time, in the answers of his administrator. It is asserted in the amended bill in somewhat loose and general terms, that Magee never did tender any such deed, and that the lands were not at the time of making the award, or at any time afterwards, free of incumbrances made by Magee. And this averment is connected with the assertion, that this was a condition precedent to any performance on his part. But this is an evident afterthought. There is not the slightest proof, that the refusal of McNeil originally proceeded upon any such ground. If he meant to rely upon it, it was his duty to have stated it at the time, for it was an objection capable of being removed; and if he had been willing to confirm and execute the award, on his part, there is scarcely a doubt that it would have been removed. The subsequent history of the case demonstrates, that McNeil never meant to comply with the award. He was dissatisfied with it. He contested its validity in the state court. He did not allude to, or admit, it in his original bill in 1823. When he stated its existence in his amended bill, it was mainly for the purpose of denying its validity; and down to the time of the last amendment in November, 1828, he never founded his title to relief exclusively upon it as a valid award. In short we cannot escape from the conclusion, that he never meant to perform it, if he could overthrow its authority; and in acceding to it now, he yields only to the force of circumstances, and the operations of law upon his title. Doubtless he had a right so to do; but in every such case a party must act at his peril, and must submit to those consequences, which his own delay and refusal unavoidably introduce in the way of relief. Now, nothing is better settled than that a court of equity will not interfere to decree a specific performance, where the party seeking it has been guilty of gross laches, or long voluntary delay, and in the meantime there has been a material change of circumstances. The party will be left to take his remedy at law, where the delay or neglect has been without just excuse, and there is no longer a prevailing and decisive equity to sustain his claim.[3] This is true not only as to agreements generally, but as to awards founded upon agreements, for equity interferes in respect to awards, only as growing out of agreements.[4] If therefore a court of equity

[3] See 1 Madd. Ch. Prac. 329, 330, 331; Sugd. Vend. c. 8, § 1; 2 Pow. Cont. 19, 22, 260; Hayes v. Caryll, 1 Brown, Parl. Cas. 127; Van Benthuysen v. Crapser, 8 Johns. 198; 1 Fonbl. Eq. bk. 1, c. 6, §§ 1, 2, 12; Harrington v. Wheeler, 4 Ves. 686; Alley v. Deschamps, 13 Ves. 225; Wright v. Howard, 1 Sim. & S. 190; Parker v. Frith, Id. 199, note; Pratt v. Carroll, 8 Cranch [12 U. S.] 471.
[4] See 1 Bac. Abr. "Arbitrament & Award," 1; Caldw. Arb. c. 7, p. 172; Kyd. Awards, 322; 3 P. Wms. 187; 17 Ves. 232; 1 Swanst. 48, 54.

perceives, that the delay, voluntary on the part of the party seeking a specific performance, has been very injurious to the other party, so that it would be inequitable to decree a specific performance, that alone is sufficient to induce the court to withhold its aid.[5]

It has been further suggested, on behalf of the defendants, that the plaintiff has disabled himself to comply with his part of the award, for he has released his equity in the lands awarded to Magee, to Binney, who is a purchaser claiming by a mesne conveyance, under the latter; and therefore a release to Magee afterwards became impracticable, in the sense of the award, since it would have been inoperative in point in law. There is some force in the objection; but whether to the extent, which the objection assumes, may admit of doubt. It certainly however cannot be admitted that McNeil could, in this manner, discharge himself, by his own act, from a strict compliance with the terms of the award. His release to Magee would operate at least as a confirmation of the absolute title of Magee in the land; and in this respect would be material to the covenants of warranty on any sale made by the latter. It is not denied, that McNeil did make a release, as stated, to Binney, in the year 1819; though it purports on its face to be for the nominal consideration of $1 only. The procurement of such a release, even at that late period, shows, that at least in the mind of the purchaser, the title was not absolutely perfect, and free from doubt. But it is the less necessary to dwell on this view of the matter, because there is one of far more importance pressing on the case, and which can never be lost sight of by a court of equity. It cannot admit of doubt, that the omission of McNeil to give the release required by the award, must have materially affected the marketable value of the property awarded to Magee. If the existence of the award, and of McNeil's dissatisfaction with it, and refusal to ratify it, were half as notorious as the plaintiff now contends it was, it must have materially injured any sale by Magee. No cautious purchaser could incline to take a title then in dispute, and over which such a cloud hung, unless at a sum far below its real value. The sum due to Magee was $27,100, and his whole means of reimbursement were exclusively confined by the award to the lands estimated at that value. The estimate of the arbitrators proceeded upon the ground, that Magee should possess an indisputable title. Its marketable value was essentially connected with the existence of such a title. A prompt compliance with the award on the part of McNeil was indispensable for this purpose; and every delay on his part was injurious to Magee. Mr. Welsh's deposition shows, that Magee offered at the time to give up

[5] See Crofton v. Ormsby, 2 Sch. & L. 583.

the lands to McNeil, for $5,000 less than the sum for which they were set off to him; and McNeil was unwilling even to offer for them more than $20,000. All these lands (excepting those mortgaged to Margaret Magee) were mortgaged to Simon Eliot, by Magee, in December, 1814, (more than three years after the award,) as security for $9,800, and for other purposes, with a power to sell, and subject to a prior incumbrance to Jonathan Amory, in March. 1809, for $3,000 and interest. By subsequent assignments and conveyances, the whole became vested in Amos Binney; but there is no evidence of the exact amount realized therefor. But from the silence of all parties on this head, connected with the averments in the answers, and other circumstances in proof, there is no reason to presume, that it exceeded the mortgages. So that, at the utmost, the available proceeds of the lands awarded to Magee, (including the premises mortgaged to Margaret Magee,) so far as they can be traced, may be presumed not to have exceeded the sum of $22,550. In fact, the answer of Magee's administrator avers, that there was a loss to Magee of $5,000 exclusive of interest. In what manner this depreciation was occasioned, it would perhaps be difficult, if not impossible, at this distance of time, precisely to ascertain. But we have a right to presume, that the land was in 1811 worth the full amount at which it was estimated by the arbitrators. It did not realize that amount when sold. The loss (whatever it was) actually fell upon Magee. This court has no right to say, that the same loss would have occurred if McNeil had punctually, when he was requested, executed the release. The original offer of Magee to take $5,000 less than his claim, is no proof that the land was not at that time worth the full sum awarded, for it probably was an offer to buy peace; and at all events it demonstrated, that a prompt realization of the value of the lands was, in Magee's own view, of great importance to his interest. In fact, if the court were compelled to judge of the injury to Magee by the imperfect facts before it, it would not be an irrational conclusion, that the refusal of McNeil up to the sale in 1814, had worked an injury to Magee exceeding the full value of the lands awarded to McNeil. He was entitled to a perfect, unclouded title, in a time of peace; and he was compelled to sell the lands, without any such benefit, in a time of war. Indeed, the argument from the defect of title, is pressed upon the court under another aspect by the plaintiff's counsel, against the defendants now in this cause; and it is urged, that they purchased cheaply from the very circumstance that there was a cloud upon the title. They purchased for $3300, upon the face of their deeds, though, from some unexplained circumstance, I find it stated in the answer of the administrator, that Magee realized no more than $2600.

The answer of the administrator relies upon this delay and refusal of McNeil, as a justification of Magee in selling the lands awarded to McNeil to indemnify himself for his losses and damages. Now, this court certainly cannot justify such a procedure. It is no excuse for A, that he sells B's lands, because B has injured him to an extent equal to their value. The act is, in point of law, utterly indefensible. But when a court of equity is asked to compel a specific performance in a case of injurious delay, voluntary and unjustifiable on the part of him, who seeks the aid of the court, it is bound to look at that fact, and to consider, whether it ought to be active in his favour. It has a right under such circumstances to say, that it will leave the parties to their respective remedies at law for mutual damages, rather than hazard a decree, which might administer justice only on one side. But to this presumption of loss and injury, there are to be added the lapse of time, and laches of the plaintiff, and a material change of circumstances in the intermediate period. Twelve years elapsed after the award, before the original bill was filed. Five years more, before the plaintiff admitted the validity of the award, and, by an amendment, confined his claim to the title derived under it. Magee died in 1823 insolvent, and before he had made any answer to the bill; and the equities between him and McNeil are now to be ascertained and litigated by persons, who are utter strangers to all the original transactions.

Now, I have not been able to find a single case, where a court of equity has decreed a specific performance under circumstances like the present. Lapse of time is sometimes overlooked, but only when there has been reasonable diligence by the party seeking a decree; or, as some of the cases say, where "he has shown himself ready, desirous, prompt, and eager." Milward v. Earl Thanet, 5 Ves. 720, note; Sugd. Vend. c. 8, § 1. Laches may be excused; but it must be under strong controlling circumstances. Sugd. Vend. c. 8, § 1; Benedict v. Lynch, 1 Johns. Ch. 370. But where a party has perseveringly, through a course of years, resisted the performance of an agreement, denying its validity; where he has taken no step towards a performance on his own part, and has repelled the advances on the other side, no case can, as I believe, be found, at least in modern times, in which a court of equity has interfered in his favour. Especially will such a court be disinclined so to do, where the other party has expressed a willingness to perform; where a presumed injury has arisen to him from the lapse of time; where the rights of third persons have intervened; where the circumstances of the parties have changed; and where death and insolvency have materially affected the remedy, which third persons may have in the premises, in respect to their own grantor. It is no suffi-

cient answer, as has been already intimated, that Magee was unable at the time to give a deed free of his own incumbrances. The objection was not insisted on at the time, and was capable of being removed. The award itself provided a remedy by the covenants in the deed to secure the party against any such incumbrances; and at law the existence of incumbrances would not have been fatal to the award. I do not say, that a court of equity would not upon an early application have given relief in such a case; and would not have withheld a specific performance from Magee, until he had removed those incumbrances; or upon the application of McNeil would not have decreed him a compensation or indemnity pro tanto.[6] But the remedy of McNeil was just as perfect then, as it ever could be; and his long delay had a natural tendency to aggravate every evil on the other side. At this distance of time, when Magee himself is dead. it is not in the power of any court of equity to ascertain with exactness the amount of injury to Magee by that delay.[7] And it is not the habit of courts of equity to decree compensation in cases of specific performance for mere laches or delay; but compensation is usually, if not invariably, decreed upon other distinct grounds.[8] Upon this point of the case, therefore, if the question were, whether Magee himself, being before the court, as sole defendant, ought to be compelled to a specific performance at such a distance of time, under all the circumstances, there would be much room for hesitation. How could this court assume, that he had not been damnified by the delay, and refusal to perform the award. If damnified, in what manner is this court to exercise jurisdiction to decree compensation; and how is it to measure the damages? But Magee having sold, and the interests of third persons having intervened, it is plain, that no decree for a specific performance can operate, except through a vendee's holding the title. The question then, even if Magee were living a co-defendant, would become far more complicated and difficult. A decree on the part of the court for a specific performance would require it to interpose its active aid to strip these vendees of their title and possession in favour of a party, who had chosen to lay by for a great length of time, and had exhibited no legal, or reasonable diligence. I will not attempt to disguise, that I should feel the most serious difficulties in arriving at such a decree, even if the vendees had the most unequivocal notice of the plaintiff's equity.

But let us see how the case stands as to

the vendees now before the court, not only in respect to notice. but to the equities, which are set up by them in their defence. In the first place as to notice. The defendants claim under a registered title from Magee, whose title is also registered. The plaintiff originally claimed under the agreement of 1808, which was not registered until more than a year and a half afterwards. He now claims under the award, which has never been registered at all. In each case his claim is to an equity. Now, it is the settled doctrine, that under such circumstances, where relief is sought against a purchaser, there must be clear and undoubted notice; and that suspicion, even strong suspicion, is not sufficient. Sugd. Vend. c. 16, art. 4, § 5; Hine v. Dodd, 2 Atk. 276; Wyatt v. Barwell, 19 Ves. 439. It is contended in the first place, that the defendants had constructive notice of the original agreement from its registry, although not referred to in the conveyances to Magee; and that its contents were sufficient to put them upon inquiry. Unless that agreement was properly matter for registry under the Massachusetts statutes of registry, there is no pretence to say, that it was constructive notice to any person.[9] Now I very much doubt, whether the agreement, disconnected as it was from the conveyances, was proper matter for registry under the act of 1783, c. 37, or the act of 1802, c. 33. The agreement was not in any legal sense a defeasance. It was not intended wholly to defeat the conveyances in a given event. Nor was it an incumbrance on the estates conveyed. On the contrary, it was the intention of both parties, that Magee should have a complete power to make absolute titles to purchasers; and in the event of notice to him of dissatisfaction, he was to reconvey the lands remaining unsold by him, and account for all sales and purchases antecedently made. I do not know that it has ever been held under these acts of registry, that a collateral, disconnected agreement between the parties, merely affecting the title to lands, must be registered. But supposing it otherwise; still the agreement itself admits the right of Magee to make sales, until it is rescinded by a notice of the dissatisfied party; and such notice is independent of the record, and must be established by competent proofs, aliunde. No such proofs exist in this case. Magee, at the time of the sale, was in possession of the legal title. The deed, under which he claimed, contained no reference to any collateral agreement. He had a right to sell; and no purchaser was bound to make inquiry. whether there had been any revocation of such right. The existence of the right was fairly presumable, until notice of the contrary was given by

---

[6] See Sugd. Vend. c. 6, § 1.

[7] See M'Alpine v. Swift, 1 Ball & B. 285.

[8] See Sugd. Vend. c. 6, § 1: Halsey v. Grant. 13 Ves. 73; Horniblow v. Shirley, Id. 81; Binks v. Lord Rokeby, 2 Swanst. 222: Balmanno v. Lumley, 1 Ves. & B. 224: Paton v. Rogers, Id. 351; Wood v. Bernal, 19 Ves. 220; Sugd. Vend. c. 8, § 1.

[9] See Morecock v. Dickins, Amb. 678; Latouche v. Lord Dunsany, 1 Sch. & L. 137, 157, Sugd. Vend. c. 16. art. 4, § 5: Frost v. Beekman. 1 Johns. Ch. 288; Lessee of Heister v. Fortner, 2 Bin. 40.

McNeil, either personally, or by some act or public notoriety. Then as to the award, it was never registered; nor was it in fact entitled to registry. Notice of its existence therefore must be established by matter in pais. The defendants positively deny in their answers, that they had notice of any legal or equitable title in the plaintiff, at or before their respective purchases, or of the award itself, until the commencement of the present suit. The answers do not, as technically they should, deny notice at the time of the payment of the purchase money. But no exception has been taken to them on this head; and it may be fairly presumed, that they paid the money at the time of their purchases. They add, that McNeil must have known, that after the purchases, the defendants were going on, making valuable improvements on the lands; and yet that he never gave them any notice of his title; and in this respect suffered them to be misled. Against these positive denials in the answers, there ought to be strong evidence of notice to overturn their force.

The evidence of notice adduced on behalf of the plaintiff, with a single exception, is founded upon the notoriety of the submission and award, and the disputes about the title between McNeil and Magee in Charlestown, where the lands lie, and the defendants lived at the time of their purchases. To give the evidence any application, it should distinctly point to the period of the purchases, or payments of the purchase money. Any notoriety at a subsequent time cannot invalidate rights antecedently vested. There is abundance of testimony, that of late years there has been in Charlestown an extensive, if not a general, notoriety of some claim of title to the lands by McNeil. The exact manner, in which that claim of title was asserted by McNeil, whether under the award or otherwise, was not as well defined, nor marked with so much notoriety. It appears, however, to have created sufficient alarm in the minds of some of the purchasers under Magee, to induce them to obtain, for valuable considerations, quitclaims from McNeil. But the difficulty is, to trace back that notoriety to a period antecedent to June, 1814, that being the latest period at which any sale of the lands awarded to McNeil was made by Magee. Fosdick purchased in June, 1811; Wheeler purchased one parcel of land in June, 1813, and another in June, 1814; Adams purchased in November, 1813; and Collier purchased in April, 1814. These purchases include all the lands awarded to McNeil, except a strip, which has been appropriated as a street, called Lawrence street. Much of the testimony, as to the time of the notoriety, is quite loose and unsatisfactory; and that which approaches nearest to the period of the purchases is not exact, and does not (with one exception) fix personal notice upon any of the purchasers from Magee. That

it is strong enough however, to be left to a jury to infer notice, may be admitted; but this, in a court of equity, is not sufficient to outweigh the direct denial of an answer. There must at least be one positive witness, and cogent circumstances in support of his testimony, to enable a court of equity to overrule the effect of such an answer. Now the inference, generally deducible from notoriety, is in the present case somewhat shaken by the fact, that numerous witnesses. living in the same town and neighbourhood, were ignorant of the claim of McNeil and of the award, until a comparatively recent period before the commencement of the present suit. This ignorance it is difficult to account for, unless upon the supposition, that the notoriety was far less than some of the other witnesses suppose. And at all events it demonstrates, that a purchase might well have been made without actual or constructive notice. To this extent it fortifies the denials of the answers. What adds some confirmation is, that almost all of the purchasers have since made valuable improvements and erections on their estates, and that McNeil, though living in Charlestown, or its vicinity, during this period, has suffered these improvements to go on, without, as far as the court can learn, ever having given personal notice or warning to any of the purchasers. The answers of the defendants put this fact sufficiently before the plaintiff to have drawn forth some evidence on this head, at least to repel the claim for improvements, if it could have been fairly rebutted. And I cannot but think, that the testimony of Mr. Holden, one of the arbitrators, who resided in Charlestown, is entitled to some consideration, in the statement which he makes, that the rumour or report of the award, and that a quitclaim was necessary from McNeil, was not, to his knowledge, current in Charlestown, until two or three years after the award was made, when purchases began to be made of lots of the land. In respect, therefore, to the purchasers generally, although there is strong evidence of the notoriety, sufficient to raise a just suspicion of notice, I cannot say, that according to the rules of a court of equity it is so strong, as to put the stamp of falsity upon the direct denials of the answers. The exception, to which allusion has been made, is the testimony of Mr. Sawyer in respect to the purchase made by the defendant, Adams. This witness testifies to a conversation with Adams, soon after his purchase, under circumstances so peculiar, that it is difficult to resist the belief that Adams had notice at the time of his purchase, if the credibility of the witness is not impeached. It is true, that the witness is manifestly mistaken as to time, for he puts the occurrences in 1815 or 1816, whereas Adams purchased in November, 1813. But such a mistake would not ordinarily be fatal to his general credit. Still,

giving the fullest effect to the testimony of this witness, it is but one witness against the positive denial of Adams's answer; and I am not satisfied, that the other circumstances do carry with them such positive force, as entitle the court to disregard that answer.

In respect to Wheeler, who was not an original defendant, but who died before he could answer, after he was made a party, I do not find, that it is any where stated directly in the answers of the defendants, that he was a purchaser without notice, though some of the averments seem intended to include him in this predicament, but are not pointedly drawn. It is matter of regret with me, that this omission, which is obviously a clerical slip, should have occurred. The point, which it raises, is somewhat nice and difficult, but upon which, after full deliberation, I have come to a settled conclusion. The point is this,—whether a plaintiff, setting up an equitable title against a legal title in purchasers, (it may be different, where it is an equity against an equity,) is not bound to aver in his bill, that these purchasers had notice of his title; and if so bound, then, whether he is not bound to prove at the hearing the fact of notice, unless it is distinctly admitted by the answers of the defendants. I think, that he is so bound in both respects. It appears to me, that the legal title is a sufficient protection to the defendants, and that a court of equity cannot displace that title, in favour of a mere equitable title, unless, assuming all the facts stated in the bill to be true, these facts justify a decree in favour of the equitable title. Now, where the bill itself sets up a legal title in purchasers, an equity does not attach to the estate in their hands, unless they have notice of it. And, therefore, notice must be averred in the bill; otherwise the plaintiff has no case. It is true, that upon a bill filed calling for a discovery of title from a purchaser of the legal estate, as well as for relief, he may, if he pleases, interpose, as a bar to the discovery and relief, the plea, that he is a purchaser without notice at the time of his purchase, and payment of the purchase money. And in such a case his plea will be bad, without such an averment and denial of notice; and if notice is charged in the bill without a supplemental answer, also denying that notice as charged in support of his plea. But the reason is, that by the plea he sets up a positive bar to all further inquiry and all discovery. If, instead of such plea, he chooses to answer generally and go to a hearing, he may well do so. And in such a case the parties stand exactly as they do in all other cases, that is to say, the plaintiff must prove all the allegations in his bill necessary to establish his right to a decree, unless so far as they are admitted by the answer. If the answer omits to deny the notice charged in the bill, that is no admission of the notice.

The plaintiff may object to the answer for insufficiency in this respect, as he may for insufficiency as to any other fact charged. But if he takes no exception, and the cause goes to a hearing upon the general replication, it is a waiver of the exception, and the plaintiff must prove his case. If notice is essential to a decree, he must affirmatively establish it; for that is the whole foundation of equitable relief against the legal title. Some obscurity is thrown over this subject by confounding cases, where a preliminary objection is taken by way of plea, or special answer, as a bar to all further discovery and relief; with cases where there is a full and general answer and hearing, upon the whole merits. This is not the place to go into a full vindication of this doctrine, though it appears to me supported by a close comparison of the authorities, keeping in view the distinction alluded to.[10]

In my view of the matter, therefore, it is incumbent on the plaintiff to establish affirmatively, that Wheeler had notice, before the court can take from his grantees the legal estate vested in them, even supposing notice to have been brought home to the latter at their respective purchases from him. I do not dwell on this last consideration, though there is much room for observation, because there is not sufficient proof to affect the original purchasers with notice, and therefore it is not necessary to consider, how the case would otherwise stand as to notice to the subpurchasers under them. It is also a circumstance not altogether to be passed over, that Magee being dead and his estate insolvent, and the defendants having made expensive improvements upon their estates, they can, in case of a decree against themselves, have no remedy over upon their covenants of warranty against Magee, or his representatives. If McNeil, instead of lying by for so great a length of time, had pressed for redress at an early period, they might have had an effectual remedy over. I lay no stress upon the releases which the defendants have procured from Binney, because they operate as a simple extinguishment of his claim against them under the mortgage to Carey, assigned to Amory, and by him to Binney. They do not purport to assign any title, or grant an interest in or under that mortgage to either of the releases; and therefore create no bar in the way of the plaintiff.

Upon the whole, the conclusion to which my mind has arrived is, that there would be great difficulties in the way of relief for the plaintiff, if Magee were now before the court, as sole owner and defendant; that

---

[10] See Williams v. Williams, 1 Ch. Cas. 252; Harris v. Ingledew, 3 P. Wms. 91, 94; Eyre v. Dolphin, 2 Ball & B. 290, 302, 303; Jerrard v. Saunders, 2 Ves. Jr. 454, 458; Beames, Eq. Pl. 233, 245; Brace v. Duchess of Marlborough, 2 P. Wms. 491; Jones v. Thomas, 3 P. Wms. 244, note F; Sugd. Vend. c. 18, pp. 701, 702; Hardy v. Reeves, 5 Ves. 426; Coop. Eq. Pl. 312.

the equity is far less strong against the purchasers under him; and that, under all the circumstances, my duty is to dismiss the bill; but it will be without costs to either party. Bill dismissed.